Brown Estate.

216

Argued April 19, 1962. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and O'Brien, JJ.

*George E. Kearns, Jr.,* for appellant.

*F. Hastings Griffin, Jr.,* with him *Edward R. Carpenter, Robert B. Greer, Charles Myers,* and *Dechert, Price & Rhoads,* for trustee, appellee.

*Mercer D. Tate,* with him *William H. Lathrop,* and *Montgomery, McCracken, Walker & Rhoads,* for appellee.

*William White, Jr.,* with him *Martin A. Heckscher,* and *Duane, Morris & Heckscher,* for income beneficiaries, under Rule 65.

*Paul Maloney, Peter Hearn, Richard L. Freeman,* and *Pepper, Hamilton & Scheetz,* for life tenant, under Rule 65.

OPINION BY MR. CHIEF JUSTICE BELL, July 6, 1962:

Several perplexing and very important questions are raised by this appeal. The appeal was taken by the Guardian and Trustee ad litem,* appointed to represent minor and unborn contingent remaindermen, from the Decree of the Orphans' Court of Delaware County which dismissed certain exceptions filed by the Guardian to the Fifth account of the trustee of this estate.

Decedent died July 17, *1919,* leaving a last Will dated April 14, *1913,* and a Codicil thereto dated February 10, 1919. By his will, decedent devised and bequeathed his entire residuary estate, except for his New York real estate, to his Trustee, IN TRUST, to pay an annuity to his wife for her life, with provisions for the payment of income for many lives and in varying proportions. It will suffice to say that the testator provided at great length and in tremendous detail as to the distribution of both income and principal. Over the years part of the trust principal has been distributed; part of the trust still continues for the benefit of certain grandnephews and grandnieces. No question is raised as to the identity of the beneficiaries or the persons ultimately entitled to the corpus.

On July 2, 1952, the trustee filed its Fourth account. On April 8, 1953, the Orphans' Court of Delaware County handed down an adjudication and memorandum opinion holding that the trustee "was duly au-

---

* Hereinafter referred to as Guardian.

thorized by the legislature and not prohibited by the testator in investing funds of this trust estate in common stocks [and Authority bonds] meeting the requirements of the statute."* *No appeal was taken from this adjudication.*

The auditing Judge stated in his adjudication sur the present (fifth) account: "The reason or purpose of the filing of the present Accounting is the desire of the trustee [a] to secure judicial determination of the extent of the investment powers of the trustee and [b] to obtain Court approval of the transfer of certain items from principal to income by reason of allocation of proportionate share of proceeds of certain apportionable events."

When the present (fifth) Account was filed on April 9, 1959, a different Guardian and Trustee ad litem was appointed and he filed objections, inter alia, (a) to the investment power of the trustee and (b) to the legality of certain investments which appeared in this Account and (c) to the apportionment of stock dividends, corporate distributions and gains from sale of certain securities. He also contended that the Orphans' Court should review several of its rulings which were made in adjudicating the fourth Account, in the light of three recent decisions of this Court, viz., *Kelsey Estate*, 393 Pa. 513, 143 A. 2d 42 (1958) ; *Jeffries Estate*, 393 Pa. 523, 143 A. 2d 391; *Saunders Estate*, 393 Pa. 527, 143 A. 2d 367. From the Decree which (a) reaffirmed the Orphans' Court's rulings in the fourth accounting, and (b) dismissed the objections and exceptions of the Guardian as set forth in the Adjudication, as amended, this appeal was taken by the Guardian.

The investment powers of the trustee are contained in Item Fourth of the Will, in which decedent devised

---

* The Fiduciaries Investment Act of August 24, 1951, infra.

and bequeathed the residue of his estate (except his New York real estate),

"To Girard Trust Company and its successors IN TRUST, nevertheless, for the following uses and purposes: To retain existing investments or to sell the same and make reinvestments *as hereinafter provided;** to invest and reinvest in mortgages which are a first lien on real estate in Pennsylvania and New York, in the first mortgage bonds of *dividend paying* railroads, in car trust or equipment trust certificates of *dividend paying* railroads, in United States loans, in the loans of the State of Pennsylvania and the State of New York, in loans of municipalities, township, school districts *and similar public divisions in the State of Pennsylvania,* and in ground rents *in the City of Philadelphia; . . . .*"

At the time the Will was drawn in 1913 and also at testator's death in 1919, investment of trust funds in the stock of a private corporation was prohibited by Section 22 of Article III of the Constitution. The Constitution was amended in 1933 to permit such a statute, but not until 1947** did the Legislature permit investment of trust funds in preferred stock of a private corporation (which met certain statutory requirements). The Fiduciaries Investment Act of 1949*** codified previous statutes and authorized investment in such preferred stock. In 1951, the Legislature amended the Fiduciaries Investment Act and authorized investment in common stock (which met certain statutory requirements).****

This appeal raises four issues:*****

---

* Italics throughout, ours.

** Act of June 27, 1947, P. L. 1080, §13.

*** Act of May 26, 1949, P. L. 1828, §9a, 20 PS §821.1 et seq.

**** Act of August 24, 1951, P. L. 1410, §1, 20 PS §821.9.

***** The questions raised in this appeal affect hundreds of estates throughout Pennsylvania.

1. What is the meaning of *"similar public divisions in the State of Pennsylvania"*?

2. Were investments in common and preferred stock of private corporations validated for this trust estate by the Fiduciaries Investment Act of 1949, as amended in 1951?

3. Is the Guardian estopped to raise these questions because of the rulings of the Orphans' Court in adjudicating the Trustee's fourth Account in this Estate?

4. With reference to questions of apportionment, Is the present audit in this estate an audit "now pending and henceforth" within the meaning of *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86 (1961)?

We shall first state certain principles which will guide us in our determination of the controversial issues raised herein. In considering the application of the Fiduciaries Investment Act of 1949, this Court said, in *Saunders Estate,* 393 Pa. 527, 529: "The testator's intention is the pole star in the construction of every will and that intention must be ascertained from the language and scheme of his will; it is not what the Court thinks he might or would or should have said in the existing circumstances, or even what the Court thinks he meant to say, but what is the meaning of his words. Kelsey Estate, 393 Pa. 513, 143 A. 2d 42; Britt Estate, 369 Pa. 450, 87 A. 2d 243; Sowers Estate, 383 Pa. 566, 119 A. 2d 60; Cannistra Estate, 384 Pa. 605, 121 A. 2d 157."

In *Kelsey Estate,* we said (page 519) : "Courts cannot, even when aided by hindsight and the ingenuity of counsel, rewrite a settlor's deed or a testator's will, or distort or torture his language or the language of a statute relating thereto, in order to attain what we believe is beneficial and wise, or even what we believe settlor would or should have provided if he had possessed a knowledge of all presently existing circum-

stances." See to the same effect, *Althouse Estate*, 404 Pa. 412, 416, 172 A. 2d 146.

## "Similar Public Divisions"

1. The trustee has invested part of the trust corpus in Pennsylvania Turnpike bonds and various Authority bonds. It is clear that these investments are in some respects similar and in some respects dissimilar to the investments enumerated by testator. First of all, "similar public divisions" means *public divisions* similar to the public divisions enumerated by testator, viz., bonds of "municipalities, townships and school districts". We think it is clear that testator meant political subdivisions* such as those specifically enumerated by the testator.

Testator limited his trustee to what were at that time regarded as exceptionally safe investments, namely, investments in United States loans, in the loans of the State of Pennsylvania and the State of New York, in first (lien) mortgages on real estate in Pennsylvania and New York, in first mortgage bonds not of all railroads, but of *dividend-paying* railroads, and not in any car trust or equipment trust certificates, but in car trust or equipment trust certificates of *dividend-paying* railroads, and not in any ground rents in Pennsylvania, but *in ground rents in the City of Philadelphia*, and in loans of municipalities, townships, school districts, and similar public divisions, and even these were restricted to the State of Pennsylvania. Moreover, Testator did not even give his trustee power to invest in what at the time of his will or at the time of his death were legal investments under the law of Pennsylvania; on the contrary he limited his trustee to cer-

---

* A school district is a political subdivision: *Wharton v. School Directors*, 42 Pa. 358; *Commonwealth v. Beamish*, 81 Pa. 389; *Briegel v. City of Philadelphia*, 135 Pa. 451, 19 A. 1038; *Breslow v. Baldwin Township School District*, 408 Pa. 121, 182 A. 2d 501.

tain specifically enumerated investments. He did not even authorize his trustee to invest in ground rents in the Commonwealth of Pennsylvania which, at the time of his death, were an authorized legal investment; on the contrary he authorized it to invest only in ground rents in Philadelphia. Although specifically authorizing investments in loans of municipalities, townships and school districts, he did not specifically authorize investments in loans of cities, counties or boroughs which were legal investments for a trustee at the time testator made his will. However, it is reasonable to conclude that it was these political subdivisions with their tax-raising power which he had in mind and intended in and by the words "similar public divisions in the State of Pennsylvania." It is clear that the investment powers given to the trustee by this testator, so far as bonds of municipalities, townships, school districts and similar public divisions in the State of Pennsylvania are concerned, were the bonds of political subdivisions of Pennsylvania, all of which possessed the power of taxation and hence provided the maximum safety in this investment field which the testator desired and intended.

The bonds of the Pennsylvania Turnpike Commission and of (approximately 300) other Authorities, which are often denominated "instrumentalities of the Commonwealth of Pennsylvania", are not the bonds of the Commonwealth of Pennsylvania or of any political subdivision thereof, nor are they supported by the tax-revenue-producing power or by the full faith and credit of those political divisions of government. It seems to us that this was the kind of a limitation and the requisite protective authority with which testator intended to authorize and limit his trustee's power of investment when he used the words "similar public divisions" in connection with loans of municipalities, townships and school districts.

The Act of May 21, 1937, P. L. 774, under which Pennsylvania Turnpike Commission bonds are issued, provides (§2) : "That turnpike revenue bonds issued under the provisions of this Act shall *not* be deemed to be a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth, but such bonds shall be payable exclusively from the fund herein provided therefor from tolls."

Similarly, the Legislature did not consider the entities or Authorities created under the Pennsylvania General State Authority Act of March 31, 1949, P. L. 372,* or under the Housing Authorities Law, Act of May 28, 1937, P. L. 955, as political subdivisions of the Commonwealth.

Section 4 of the Act of March 31, 1949, supra, which re-created the General State Authority, provided: "Provided further, That the Authority shall have no power at any time or in any manner to pledge the credit or taxing power of the Commonwealth or any of its cities, counties, school districts, *or other political subdivisions,* nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth or any of its cities, counties, school districts, *or political subdivisions,* nor shall the Commonwealth or any city, county, school district, *or political subdivision* thereof be liable for the payment of principal of, or interest on, such obligations."

Section 17 of the Housing Authorities Law, Act of May 28, 1937, P. L. 955, provided: "Such bonds or other obligations of an Authority shall *not be a debt of any city, county, municipal subdivision or of the Commonwealth and shall so state* on their face, nor shall any city, county, *municipal subdivision* or the Commonwealth, nor any revenues or any property of any city,

---

* This re-created the Authority. See Act of June 28, 1935, P. L. 452, §4(n).

county, municipal subdivision or of the Commonwealth be liable therefor."

Section 3 of the *Fiduciaries Investment Act of 1949\** deals with authorized investments. It provides: "Section 3. Government Obligations.—Obligations of the following governmental bodies shall be authorized investments: . . . (3) State and Local Government. Obligations of any commonwealth or state of the United States, or any county, city, borough, town, township, school district, institution district, or other political subdivision, *having the power to levy taxes*, of any such commonwealth or state: *Provided,* That the faith and credit of such commonwealth, state, or political subdivision thereof, is pledged for the payment of said obligations: . . . ."

It is hornbook law that the intention of the testator is the pole star in the construction of every will and in order to ascertain his intention we place ourselves in the armchair of the testator and consider the language and scheme of his entire will in the light of the attendant circumstances which surrounded him at the time he made it. Cases, supra.

However, where a testator uses words which have *a legal or technical meaning,* " 'they are to be so interpreted according to the law in effect at the testator's death unless the will contains a clearly expressed intention to the contrary': Farmers Trust Co., Executor, v. Wilson et ux., 361 Pa. 43, 46, 63 A. 2d 14, and cases therein cited: Ashhurst's Estate, 133 Pa. Superior Ct. 526, 3 A. 2d 218; . . . ." *Collins Estate,* 393 Pa. 195, 200, 142 A. 2d 178. Cf. *Lyman Estate,* 366 Pa. 164, 170, 76 A. 2d 633.

It is not necessary to decide in this case whether the phrase "similar public divisions" had at the time

---

\* The Act, in subsequent sections, authorized many additional investments by a fiduciary including the right to invest in Authority bonds for which the faith and credit of the Authority is pledged.

of execution of the will or at the time of testator's death, *a legal or technical meaning,* because in this case the same result will follow irrespective of which is the applicable date.

At the time the testator executed his will and likewise at the time of his death the Pennsylvania Turnpike bonds and similar Authority bonds were not only not legal investments, they were unknown. How can it be justifiably said that testator intended to permit these investments when *neither they nor their kind* were in existence at the time he made his will or even at the time he died. It is clear that the bonds issued by the Pennsylvania Turnpike Commission and those issued under the General State Authority Act of 1949, and under the Housing Authorities Law of 1937 (and under other laws creating hybrid Authorities) were not similar to those "issued by municipalities, townships, school districts and similar public divisions" (as that language is used by the testator) where the taxing power and the full faith and credit of the political subdivision is pledged to pay principal and interest.

We therefore hold that investments in the bonds of the Pennsylvania Turnpike Commission and of various other Authorities were not authorized by the aforesaid investment powers of testator's will.

### Common and Preferred Stocks

2. Were the investments in the common and preferred stock of private corporations proper?

Testator, after bequeathing and devising his residuary estate\* to a trustee, authorized the trustee (as hereinabove mentioned) "to retain existing investments or to sell the same and *make investments as hereinafter provided.*" Testator then enumerated certain investments hereinabove set forth—which were at that time

---

\* Except New York real estate.

considered exceptionally safe investments—but did not mention common or preferred stock of private corporations which at that time were *constitutionally prohibited* investments. Thirty years after testator's death, the Fiduciaries Investment Act of 1949, as amended in 1951,* permitted investment in bonds and in common and preferred stock of private corporations meeting certain requirements. Section 18 of the Act as amended pertinently provides, ". . . whenever any such [testamentary investment] provision shall conflict with this act, such provision shall control notwithstanding this act. In the absence, however, of an *express* restriction to the contrary in the trust instrument, the fiduciary may invest in any investment authorized by this act."

"Section 22. Effective Date.—The provisions of this act shall become effective upon final enactment and shall apply to all investments *thereafter held or acquired* by fiduciaries."

It is contended, and the Orphans' Court held that this Act applies not only to trusts thereafter created but also to trusts previously created. Does this proviso rule Brown's Will, and if so is the Act unconstitutional as to preexisting trusts?

Appellee argues that Section 18 merely sets forth a *new rule of construction,* which is controlling only if testator has not expressly expressed a contrary intent. He takes this position in order to avoid the issue of unconstitutional retroactive application of the Act. In other words, a *testator's intent* is to be ascertained by a new rule of construction which was passed by the Legislature more than 30 years after testator's death and of which he could not possibly have been aware. This is unsupportable in reason, in logic, or in law.

---

* Act of May 26, 1949, P.L. 1828; Act of 24 August 1951, P.L. 1410; 20 PS §821 et seq.

This Court said, in *Lyman Estate,* 366 Pa. 164, 171, 76 A. 2d 633, quoting from *Gordon Estate,* 360 Pa. 325, 330, 61 A. 2d 849, "'. . . it is elementary that such rules are never applied to defeat the expressed intention of a testator.' *Manifestly, such intention cannot justly be ascertained by an ex post facto rule of construction.*" (Emphasis supplied)

In *Kelsey Estate,* supra, the Court said (page 518): "A testator or settlor may '" condition his bounty as suits himself, so long as he violates no law in so doing. When a trust of this kind has been created, the law holds that the *donor* has an individual right of property in the execution of the trust; and to deprive him of it would be a fraud on his generosity" . . . "cujus est dare, ejus est disponere"': Borsch Estate, 362 Pa. 581, 587, 588, 67 A. 2d 119. This principle has been firmly imbedded in our law for over 100 years: Holdship v. Patterson, 7 Watts 547, Heyl Estate, 352 Pa. 407, 43 A. 2d 130; Riverside Trust Co. v. Twitchell, 342 Pa. 558, 20 A. 2d 768; Harrison's Estate, 322 Pa. 532, 185 A. 766; Morgan's Estate, 223 Pa. 228, 72 A. 498. See also Grote Estate, 390 Pa. 261, 135 A. 2d 383."

Assuming arguendo, without deciding, that Section 18 of the Fiduciaries Investment Act of 1949 as amended in 1951 applies and is constitutional, does testator's restrictive language authorizing certain specifically enumerated investments, as thereinafter provided, constitute an *express* restriction against an investment in others? It would not only be unreasonable, it would be absurd to rule that the Legislature intended to require a testator who had died 30 years before, to use the identical express language used in the Act of 1949. *Saunders Estate,* 393 Pa. 527, 143 A. 2d 367. Here the trustees were authorized and limited to make investments *"as hereinafter provided."* This, when followed by an enumeration of certain specified investments

constitutes an express restriction within the meaning of this Act. These words, while not identical with those used in *Saunders Estate*, 393 Pa., supra, are in effect similar thereto and the equivalent thereof. In *Saunders Estate* the will read: ". . . I direct that my Executor and Trustee shall have power to invest and reinvest in Government Bonds *only* or Bonds guaranteed by the Government." This Court held that language amounted to an express restriction* and stated: "This language is clear, unambiguous, unequivocal, imperative and mandatory, and without any doubt limited and restricted her fiduciary's power of investment and reinvestment to Government bonds or bonds guaranteed by the Government and thus prohibited the fiduciary from any other kind of investment. Where a testatrix uses clear, unambiguous and mandatory language, it is not necessary for her to spell out the limitation or restriction of investment powers in the identical language used in a subsequent act of the Legislature."

In *Borsch Estate*, 362 Pa., supra, this Court, speaking through Mr. Justice ALLEN M. STEARNE, stated: "Irrespective of the true nature of the testamentary direction (i.e., whether or not it constitutes a vested property right), it is, nevertheless, a testamentary direction which always heretofore has been enforced by this Court. We said, in Stoffel's Estate, 295 Pa. 248, 145 A. 70, P. 251, 'One possessed of testamentary capacity, who makes a will in Pennsylvania, may die with the justifiable conviction that the courts will see to it

---

* In *Kelsey Estate* and in *Jeffries Estate*, supra, testator's language was stronger. In *Kelsey Estate*, the testator authorized his trustee to invest in "such other securities as to it shall seem proper . . . but . . . the power of investment of said Trustee shall not in any event include the right to invest in stocks." Similarly, in *Jeffries Estate*, testator gave his trustees power to make investments "without being confined to what are known as legal securities, but they shall have no power to purchase shares of stock."

that his dispositions, legally made, are not departed from . . . or improperly defeated . . . . The law will not permit that to be accomplished by indirection which cannot be done directly . . .' ".

Today life tenants are like political divisions of Government—they want and need more money. There are not many in the Legislature or in the Courts to champion or protect the interests of unknown remaindermen and even fewer who still believe that a man who works hard all his adult life has a right to will and condition or limit *his own estate* as he desires. The temptation for all of us is to be human and favor the known over the unknown and the dead, even if we have to change a testator's will or intent (for the worthy objective of benefiting the primary objects of testator's bounty) in order to do so. But this is not the law.

It is clear that testator intended to prohibit an investment in common or preferred stock. Since we hold that the restrictive investment clause in Brown's Will is an express restriction within the meaning of the Fiduciaries Investment Act of 1949, as amended, it is unnecessary to pass upon the constitutionality of the Act so far as concerns trusts which were created prior thereto.

### Estoppel

3. The income beneficiaries further contend that under the doctrine or principle of (a) Res judicata, and (b) "the law of the case," the appellant may not question the propriety and validity of the challenged investments because the validity of such investments was decided by the Orphans' Court in a prior accounting in this very Estate. We disagree with this contention for each of the following reasons.

The Orphans' Court re-examined its previous rulings and reaffirmed them in the present (fifth) accounting. This raised all the issues anew and allowed

appellant to challenge them in this appeal. For this reason, and likewise because a ruling of law by an Orphans' Court upon the distribution of a portion of an estate is not binding upon the Court in a subsequent adjudication relating to another portion of the same estate, the broad general principle of res judicata does not apply. The classic statement of the *general* rule of res judicata was expressed in the leading case of *Wallace's Estate,* 316 Pa. 148, 153, 174 A. 397—which has been reiterated as recently as *Downing v. Halle Bros. Co.,* 395 Pa. 402, 409-410, 150 A. 2d 719—but this rule does not apply to this accounting.

Equally important, "the law of the case" is inapplicable because, inter alia, it applies only to decisions by an appellate Court: *Burke v. Pittsburgh Limestone Corporation,* 375 Pa. 390, 100 A. 2d 595; *Reamer's Estate,* 331 Pa. 117, 200 A. 35.

In *Reamer's Estate* the Court, speaking through Mr. Justice (later Chief Justice) HORACE STERN, said (pp. 120-121, 122) : "It has consistently been held that a ruling of law by an orphans' court in dealing with the *distribution* of a portion of an estate is not binding upon a subsequent adjudication relating to another portion. While errors committed with regard to one fund may be irremediable as to it, they do not impose upon the court the necessity of persisting in the same errors in the disposition of a subsequent fund: Kellerman's Estate, 52 Pa. Superior Ct. 412; 242 Pa. 3. It was said by the Supreme Court in that case (pp. 12, 13) : 'But the rule of estoppel does not extend to the law which was applied in the earlier distribution to the facts there ascertained when it comes to the second distribution. Though the decree in the first may have rested on a mistaken application of a rule of law—a circumstance which can only be inquired into on appeal—so long as the decree stands it is conclusive *with respects to all rights in the fund distributed;* but it

cannot be made the basis of an estoppel *when another distinct fund is to be distributed* though it be part of the same estate. The law applied in the first distribution if inapplicable, *is not the law of the case*; the duty of the auditing judge in distributing on a second account is to distribute according to law, just as this is the duty of a judge in the first distribution; and in discharging this duty he must be free to disregard a decision of his own, or that of another, upon the same bench, which as he is better informed he would reject. . . . The plain logic of this is that the distributions are wholly distinct and separate, each having its own subject-matter, . . . .'

"The doctrine of 'the law of the case' is that, when an *appellate* court has considered and decided a question submitted to it upon appeal, it will not, upon a subsequent appeal on another phase of the same case, reverse its previous ruling even though convinced that it was erroneous. This rule has been adopted and frequently applied in our own State. It is not, however, inflexible."

We therefore hold that as to the investments involved in the present accounting, no estoppel arises either under the principle of res judicata or "the law of the case."

### Pending Audit

4. Apportionment of stock dividends, corporate distributions and gains on sales of securities were made by the trustee, and approved by the Orphans' Court in an adjudication of this account. The apportionment calculations were made pursuant to the Pennsylvania Rule of Apportionment which was abolished by the Supreme Court in *Catherwood Trust,** 405 Pa. 61, 173 A. 2d 86.

---

* The writer of the present opinion filed a lengthy dissenting opinion in *Catherwood Trust*, but the Court's opinion in that case must, of course, be followed.

In *Catherwood Trust,* supra, this Court said (page 78) : "In all audits *now pending* and henceforth, distributions shall be made under the provisions of the Principal and Income Act of 1947." The validity of the apportionments made in this accounting depends upon whether on the state of the record this was an audit *now pending* within the meaning of *Catherwood Trust.*

*Catherwood Trust* was handed down and filed by this Court on July 26, 1961. The present account was called for audit by the Orphans' Court on June 1, 1959. The account included apportionments which took weeks of investigation and mathematical calculations in order to comply with the rules which were at that time applicable. The adjudication in the *Brown Estate* was handed down by the Orphans' Court on *the day after Catherwood* was handed down by this Court. It is clear from an examination of the record and the opinion of the lower Court that it must have taken the Court a very considerable time to prepare its adjudication. There has been in Pennsylvania no uniform or universal understanding and interpretation of the word "audit", and the practice of auditing and/or confirming an account differs widely. In Philadelphia County, for example, where no questions of fact or law are raised, an audit or hearing by the Court is informal and very short. It consists of a "hand-up" of papers in open Court at the time the estate is called for audit, accompanied or followed by a statement of counsel for the accountant: "no questions." It has generally been considered that this is an audit. It is then followed by an adjudication which is signed by the judge. If objections are made or exceptions filed when the estate is called for audit, a definite time is fixed for a hearing before the auditing judge, at which time testimony may be presented and questions of law may be argued. Thereafter a decision, usually in the form of an adjudication, is made by the

auditing judge. In these contested cases (as well as in the cases where exceptions were not filed at the time the estate was originally called for audit) exceptions can thereafter be filed, in which event the case is orally argued before the Orphans' Court en banc.

In some counties no hearing sur an account is initially held by the Court, while in other counties an audit includes more than merely handing up to the Court a petition for distribution and appearance slips. In such instances, the Court refers to an auditor or subsequently examines the account which has, of course, been previously filed and advertised, and until the auditor's report is approved or an adjudication handed down by the auditing judge, the audit is not considered complete. In *Ray's Estate*, 345 Pa. 210, 25 A. 2d 803, the Court said (p. 213) : "Prior to, and since, the Act, it has been common for executors and administrators to collect claims, pay debts and make distribution without accounting or audit. In some counties accounts are confirmed as of course if no exceptions are filed within specified periods; in others, formal confirmation by the court is pronounced on presentation of accounts to which no exceptions have been filed. Automatic confirmation pursuant to a rule of court is not an audit."

In "hand-ups" and in cases where exceptions have been filed to an account, do the words "pending audit" mean and include proceedings until a final decision is made by the Orphans' Court en banc, or until a schedule of distribution is filed, or exactly what does it mean? And when all the parties agree to an apportionment and so advise the Court at the time the estate is called for audit, is that a pending audit before the Court files an adjudication?

The intendment of *Catherwood* was to continue the application of the Pennsylvania Rule of Apportionment to situations where *at the time of Catherwood* an ac-

234

count had been *filed* by the fiduciary, and a hearing or audit of said account had been held, and that in all other situations the Principal and Income Act of 1947 was to apply. In the instant case, an account having been filed and a hearing or audit held, the Pennsylvania Rule of Apportionment would govern the distribution, even though the Court's adjudication or decision was filed *subsequent to Catherwood*.

Decree reversed, case remanded to the Orphans' Court for such further proceedings as it may deem appropriate or necessary. Costs to be paid out of the principal of the estate.