503 A.2d 400

**Gerald JACKSON, et al., Appellees,**

v.

**Edward J. HENDRICK, et al., Appellants.**

Supreme Court of Pennsylvania.

Submitted Feb. 15, 1985.

Decided Jan. 16, 1986.

458

Barbara W. Mather, City Sol., Richard J. Gold, Divisional Deputy City Sol., August V. Sellito, Guy P. Vilim, Asst. City Sols., for appellant.

David Rudovsky, First Asst. Defender, Donald Bronstein, Asst. Defender, for appellee.

Gregory R. Neuhauser, Deputy Atty. Gen., for Com. of Pa.

Eric B. Henson, Deputy Dist. Atty., for Philadelphia Co.

Dennis R. Biondo, Pittsburgh, for Allegheny Co.

James M. McNamara, Doylestown, for Bucks Co.

Frederick M. Wentz, Norristown, for Montgomery Co.

John S. Halsted, West Chester, for Chester Co.

Matthew S. Donaldson, Jr., Media, for Delaware Co. Bd. of Prison Inspectors.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This Court has assumed extraordinary jurisdiction of appeals by officials of the City of Philadelphia from two orders entered by the Philadelphia Court of Common Pleas in the wake of protracted litigation concerning conditions in the Philadelphia prison system. The first order established timetables for the reduction of the prison population and the elimination of double and triple-celling of inmates. The second held the appellants in contempt for noncompliance with those schedules and imposed monetary sanctions. Our review herein is limited to a determination of the proper standard to employ when adjudging whether the over-crowding of prison inmates amounts to cruel and unusual punishment under the Eighth Amendment to the United States Constitution. U.S. Const. Amend. VIII. For the reasons which follow, we must vacate the contempt order and remand this matter to the Court of Common Pleas for further proceedings.

## I.

The tangled history of this case spans over fourteen (14) years. In February 1971 five (5) prisoners in the Philadelphia prison system filed a class action in equity against City officials [1] in the Philadelphia Court of Common Pleas seeking injunctive relief from conditions of confinement alleged to violate the prisoners' constitutional and statutory rights. A three (3) judge panel heard extensive testimony and, on

1. Named as defendants were the Superintendent of Philadelphia prisons, the Mayor, the members of City Council, the Welfare Commissioner, the Board of Trustees of Prisons and the Wardens of Holmesburg, Eastern State, the Detention Center and the House of Correction.

April 7, 1972 issued an opinion and decree *nisi* holding that the prisoners' conditions of confinement violated their constitutional and statutory rights [2] and amounted to cruel and unusual punishment under the federal and state constitutions. The panel's conclusion that conditions in the prison system were unconstitutional was based upon findings of overcrowding coupled with inadequate facilities and staff. Specifically, it was found that cells were drafty, cold, damp, dirty and infested with roaches and other vermin; that a shortage of guards increased the danger of assault; that an effective inmate classification system was lacking; that personal hygiene, medical and psychiatric needs were inadequately attended to; that food served did not provide adequate nutrition; and that drug addicts suffering withdrawal symptoms were not given proper treatment. The panel ordered the defendants to take immediate action to improve conditions and, in addition, ordered the appointment of a special master to assist the court in fashioning appropriate relief. After the defendants' exceptions had been dismissed and the decree made final, the defendants appealed to the Commonwealth Court. That court affirmed the denial of exceptions except as to the portion of the decree providing for the appointment of a master. *Hendrick v. Jackson*, 10 Pa.Commw. 392, 309 A.2d 187 (1973). This Court allowed an appeal on the question of the propriety of appointing a special master and reinstated the decree in its entirety. *Jackson v. Hendrick*, 457 Pa. 405, 321 A.2d 603 (1974).

On June 15, 1976 the Court of Common Pleas issued an interim remedial decree requiring the defendants to establish a "cap" on the prison population based on a "one man, one cell" principle. This decree also mandated the release of prisoners held in default of One Thousand Five Hundred Dollars ($1,500) bail or less where necessary to maintain the prison population at the level established. The defendants again appealed to the Commonwealth Court. While that

2. The court found that the conditions violated the rights to due process and freedom of communication, civil rights under federal law, Pennsylvania statutes governing prison conditions and administration and the Philadelphia Home Rule Charter.

appeal was pending the parties executed a "Stipulation and Agreement" with the approval of the Court of Common Pleas on February 4, 1977. That document provided for a population "cap," a prisoner release mechanism and numerous improvements in prison conditions. The June 15, 1976 decree was affirmed *per curiam* by the Commonwealth Court on October 17, 1977.

The parties entered into further "Stipulations and Agreements" on October 31, 1978 and May 12, 1980. The three agreements signed between 1977 and 1980 resulted in numerous improvements in prison conditions. As described by the Court of Common Pleas, those positive steps were as follows:

The health and psychiatric care delivery systems have been revamped, with the addition of staff and improved facilities. In 1980, the new Medical Services Wing was inaugurated at the Philadelphia Detention Center, vastly improving the health care facilities for both medical and psychiatric cases. This contrasts markedly with the dank and cheerless block once used at Holmesburg for that purpose.

The staff complements in social services, addictive disease treatment, and correctional services have all been augmented.... [*]

Disciplinary procedures have been codified, and an inmate grievance system ... is being implemented.

Censorship of mail has ended, with strict rules for the opening of mail for contraband only in the inmate's presence. Rules for searches of the person and of cells have been implemented.

Telephones have been installed on each cell-block, giving individuals balanced daily access to their families. Visiting hours have been revamped, and the number of visits has been increased from one to two per week. Children may now visit their parents. Contact visits now obtain, where once they were conducted through a glass wall and a telephone intercom.

The numbers of jobs and vocational training positions for inmates have increased, and are scheduled to increase further with the cooperation of the school district, and ... the numbers and accessibility of adult public education classes have increased.

Other changes, too numerous to mention, have been brought about as a result of this case, through the continuing process of Court Orders, consent decrees, Master's Reports, and improved management practices.[3] *Jackson v. Hendrick*, No. 2437 February Term, 1971 (Phila.C.C.P. March 17, 1981) slip op. at 5–7.

Nevertheless, in an order accompanying the opinion from which the above quotation is taken, the Court of Common Pleas, dissatisfied with overcrowded prison conditions, mandated a population cap consistent with "one man, one cell" occupancy.[4] On June 22, 1981 that order was amended to provide a "rated capacity" for each prison. As a result, total capacity for the prison system was fixed at two thousand one hundred ninety (2,190) inmates. The amended order prohibited triple celling immediately and double celling after August 1, 1981. Single occupancy was also mandated for all Philadelphia correctional institutions thereafter established. A detailed bail release procedure was also prescribed to permit compliance with the order. The defendant's exceptions to the amended order were dismissed,

3. The agreements also contained provisions concerning environmental conditions, a classification system, the training of guards, and prison law libraries.

4. On March 27, 1981 the Philadelphia District Attorney petitioned to intervene in this matter. His petition was denied on June 8, 1981 and he appealed to the Commonwealth Court. On July 1, 1981 the District Attorney petitioned this Court to stay the June 22, 1981 order and to assume plenary jurisdiction. A partial stay was granted per Nix and Kauffmann, JJ., on July 7, 1981 to prevent the release of dangerous prisoners. On May 25, 1982 the full Court denied extraordinary relief and vacated the stay. *Jackson v. Hendrick*, 498 Pa. 220, 446 A.2d 226 (1982). The Commonwealth Court subsequently affirmed the denial of the District Attorney's petition to intervene as well as the dismissal of the defendants' exceptions to the June 22, 1981 order. *Jackson v. Hendrick*, 72 Pa.Commw. 63, 456 A.2d 229 (1983). This Court denied allocatur on June 21, 1983.

and the Commonwealth Court affirmed. *Jackson v. Hendrick*, 72 Pa.Commw. 63, 456 A.2d 229 (1983).

The plaintiffs subsequently filed a motion for a hearing seeking further relief from overcrowded conditions. A hearing was held on February 27, 1984 and, on June 22, 1984, the Court of Common Pleas issued the order which is the principal subject of the instant appeal. That order provided in pertinent part: [5]

1. The total population of the existing institutions of the Philadelphia Prisons, i.e., Holmesburg Prison, Laurel Hill, Women's Detention Facility, Philadelphia Detention Center, and the House of Correction, shall not exceed:

(a) By October 1, 1984, 3,525 inmates;

(b) By December 24, 1984, 3,250 inmates;

(c) By March 30, 1985, 2,995 inmates;

(d) By June 30, 1985, 2,700 inmates.

2. In addition to the foregoing, all housing of three (3) inmates to a single cell shall end on and after October 1, 1984. All housing of two (2) inmates to a single cell shall end on and after June 30, 1985.

The defendants filed exceptions, which were dismissed, and subsequently appealed June 22, 1984 to the Commonwealth Court. That court denied the defendants' application for supersedeas on September 28, 1984. On October 1, 1984 the Court of Common Pleas *sua sponte* directed the defendants to demonstrate compliance with the June 22 order. The plaintiffs petitioned that court for an adjudication of contempt on October 3, 1984. At a hearing conducted the following day, it was established that the population of the Philadelphia prison system exceeded by one hundred eighty-five (185) the maximum mandated for October 1, 1984, and that five hundred forty (540) inmates were triple celled as of October 1, 1984.[6] On October 11, 1984, the

5. The June 22, 1984 order also required plumbing improvements at the Philadelphia Detention Center and the transfer of all sentenced federal and state inmates housed in the Philadelphia prison system.

6. The court also found violations of the other provisions of the June 22 order. *See* footnote (4), *supra.*

defendants were held in contempt of the June 22 order. The sanctions imposed included a fine of Forty-four Dollars ($44) per day for each prisoner in excess of the population cap set forth in the June 22 order and a fine of Three Thousand Dollars ($3,000) per month for each month the defendants remained in violation of the double and triple celling prohibitions of that order. All fines were to increase at a rate of ten percent (10%) per month. The contempt adjudication was also appealed to the Commonwealth Court.[7]

On October 15, 1984, an application for a stay of the June 22 order was filed on behalf of the Honorable W. Wilson Goode, Mayor of Philadelphia. A hearing was held on October 16, and on October 17, 1984 this writer granted a stay of paragraphs one (1) and two (2) of the June 22 order, the population "cap" and single-cell occupancy provisions.[8]

On October 31, 1984 the Commonwealth Court granted the defendants' application to transfer their appeals from the June 22 and October 11 orders to the Superior Court. The plaintiffs then requested this Court to assume extraordinary jurisdiction of the two appeals. The defendants joined in that request. On November 21, 1984 we ordered the transfer of the appeals to this Court.[9] The matter was submitted on briefs at the direction of this Court on February 15, 1985. Our order specifically limited the issue to be considered to whether the proper standard for evaluating prison overcrowding is "one-man, one-cell" or the "totality of the circumstances."

## II.

In approaching this matter we must not lose sight of the fact that the program of prison reform which gave rise to

7. Pursuant to Pa.R.A.P. 1736(b), the taking of that appeal operated as an automatic supersedeas of the contempt order.

8. The stay was made conditional upon immediate compliance with the other aspects of the June 22 order, satisfactory progress with the planning and construction of new facilities, and continued cooperation in the bail release program.

9. This Court is vested with jurisdiction pursuant to 42 Pa.C.S. § 726.

the decrees in the instant case falls under the rubric of the Eighth Amendment's prohibition of cruel and unusual punishment. U.S. Const. Amend. VIII.[10] The United States Supreme Court has cautioned that, "[i]n assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that their judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.' " *Rhodes v. Chapman*, 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981), *quoting Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979). That Court has also questioned the extent to which the judiciary should become involved in prison reform:

[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and that commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnote omitted).

Moreover, " 'the nature of the violation determines the scope of the remedy.' Therefore a court can order only relief sufficient to correct the violation found." *Ruiz v. Estelle*, 679 F.2d 1115, 1145 (5th Cir.1982), *quoting Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *see Union*

10. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment is made applicable to the States through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). This Court has held that Article I, section 13 of the Pennsylvania Constitution is coextensive with the Eighth Amendment. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

*County Jail Inmates v. DiBuono*, 713 F.2d 984 (3d Cir. 1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984).

The limitations imposed by the Eighth Amendment upon the conditions of incarceration were first considered by the Supreme Court in *Rhodes v. Chapman, supra:*

> The Eighth Amendment, in only three words, imposes the constitutional limitation upon punishments: they cannot be "cruel and unusual." The Court has interpreted these words "in a flexible and dynamic manner," *Gregg v. Georgia*, 428 U.S. 153, 171 [96 S.Ct. 2909, 2924, 49 L.Ed.2d 859] (1976) (joint opinion), and has extended the Amendment's reach beyond the barbarous physical punishments at issue in the Court's earliest cases. *See Wilkerson v. Utah*, 99 U.S. 130 [25 L.Ed. 345] (1879); *In re Kemmler*, 136 U.S. 436 [10 S.Ct. 930, 34 L.Ed. 519] (1890). Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra*, [428 U.S.] at 173 [96 S.Ct. at 2925], or are grossly disproportionate to the severity of the crime. *Coker v. Georgia*, 433 U.S. 584, 592 [97 S.Ct. 3861, 2866, 53 L.Ed.2d 982] (1977) (plurality opinion); *Weems v. United States*, 217 U.S. 349 [30 S.Ct. 544, 54 L.Ed. 793] (1910). Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification." *Gregg v. Georgia, supra*, [428 U.S.] at 183 [96 S.Ct. at 2929]; *Estelle v. Gamble*, 429 U.S. 97, 103 [97 S.Ct. 285, 290, 50 L.Ed.2d 251] (1976).
>
> No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (1958) (plurality opinion). The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. *Rummel v. Estelle*,

445 U.S. 263, 275 [100 S.Ct. 1133, 1139, 63 L.Ed.2d 382] (1980). To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. *Coker v. Georgia, supra,* [433 U.S.] at 597 [97 S.Ct. at 2868] (plurality opinion); *Gregg v. Georgia, supra,* [428 U.S.] at 182 [96 S.Ct. at 2929] (joint opinion). But such " 'judgment[s] should be informed by objective factors to the maximum possible extent.' " *Rummel v. Estelle, supra,* [445 U.S.] at 274–275, [100 S.Ct. at 1139] quoting Coker v. Georgia, supra, [433 U.S.] at 592 [97 S.Ct. at 2866] (plurality opinion)....

These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble, supra,* we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. 429 U.S., at 103 [97 S.Ct. at 290]. In *Hutto v. Finney,* [437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ] the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble, supra* [429 U.S.] at 103–104 [97 S.Ct. at 290–291]. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Id.* 452 U.S. at 345–47, 101 S.Ct. at 2398–99 (footnote omitted).

Applying the above principles to an Ohio prison at which the double celling of inmates was necessitated by an unanticipated increase in prison population, the *Rhodes* Court found no Eighth Amendment violation. The Court considered significant the district court's findings that the double celling "did not lead to deprivations of essential food, medical care, or sanitation" or "increase violence among inmates or create other conditions intolerable for prison confinement." *Id.* at 348, 101 S.Ct. at 2400. Thus the Court implicitly rejected any notion that the housing of more than one inmate in a prison cell is a *per se* violation of the Eighth Amendment.[11] The *Rhodes* Court also found the factors relied upon by the district court were insufficient to establish cruel and unusual punishment:

> The five considerations on which the District Court relied also are insufficient to support its constitutional conclusion. The court relied on the long terms of imprisonment served by inmates at SOCF; the fact that SOCF housed 38% more inmates than its "design capacity"; the recommendation of several studies that each inmate have at least 50–55 square feet of living quarters; the suggestion that double-celled inmates spend most of their time in their cells with their cellmates; and the fact that double celling at SOCF was not a temporary condition. *Supra,* at 343–344 [101 S.Ct. at 2397–2398]. These general considerations fall far short in themselves of proving cruel and unusual punishment for there is no evidence that double celling under these circumstances either inflicts

**11.** We note that the United States Supreme Court has also rejected the claim that double celling violates the Fifth Amendment right of pretrial detainees to due process. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Court acknowledged that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* at 535, 99 S.Ct. at 1871 (footnote omitted). The Court concluded, however, that double celling, without more, did not amount to punishment, rejecting the notion "that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment." *Id.* at 542, 99 S.Ct. at 1875.

unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. At most, these considerations amount to a theory that double celling inflicts pain. Perhaps they reflect an aspiration toward an ideal environment for long-term confinement. But the Constitution does not mandate comfortable prisons, and prisons of SOCF's type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court. There being no constitutional violation, the District Court had no authority to consider whether double celling in light of these considerations was the best response to the increase in Ohio's statewide prison population.

*Id.* at 348–50, 101 S.Ct. at 2400–2401 (footnotes omitted).

*Rhodes* clearly mandates consideration of the "totality of circumstances" or the "totality of conditions" in assessing challenged prison conditions. *Id.* at 363 n. 10, 101 S.Ct. at 2407 n. 10 (Brennan, J., concurring in the judgment); *Smith v. Fairman,* 690 F.2d 122 (7th Cir.1982); *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982); *Villanueva v. George,* 659 F.2d 851 (8th Cir.1981); *Madyun v. Thompson,* 657 F.2d 868 (7th Cir.1981). Under this approach a court must determine whether prison conditions, taken as a whole, either inflict unnecessary or wanton pain or amount to grossly disproportionate punishment for the crime for which the prisoner has been incarcerated. *Rhodes, supra* 452 U.S. at 347, 101 S.Ct. at 2399. In making such an inquiry it is appropriate to consider food, sanitation and medical care, *Rhodes, supra; Smith v. Fairman, supra; Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); violence, *Rhodes, supra; Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir.1982); *Ramos v. Lamm, supra;* time spent in cell and opportunity for outside activity, *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983); *Union County Jail Inmates v. DiBuono, supra;* and the general state of repair of the

facility, *Wellman v. Faulkner, supra; Union County Jail Inmates v. DiBuono, supra.*

## III.

■ Having concluded that the "totality of the circumstances" test is the exclusive test to be employed in assessing alleged Eighth Amendment violations, we must now determine whether that standard was applied in the instant case. If not it will be necessary to remand the matter to the Court of Common Pleas for further proceedings.

Initially we note that there can be no question that the sordid conditions prevailing in the Philadelphia prisons at the time of the commencement of this protracted litigation violated the Eighth Amendment. As a consequence of the 1976 remedial decree and subsequent agreements, however, there have been vast improvements in prison conditions. *See* section I, *supra.* Accordingly we believe it is proper to inquire as to whether the June 22, 1984 decree imposing a "one man, one cell" population limit is based upon a finding that, in the totality of circumstances, prison conditions remain unconstitutional and can be remedied only by requiring single-cell occupancy.

■ From the opinion of the lower court as well as the transcript of the hearing conducted on October 4, 1984, it is evident that the Court of Common Pleas simply views the "one man, one cell" principle as "the law of the case." *Jackson v. Hendrick,* No. 2437 February Term, 1971 (Phila. C.C.P. September 18, 1984) slip op. at 4; Notes of Testimony, October 4, 1984 at 85. The court did not hold that current overcrowding together with other prison conditions, viewed in their totality, continued to violate the Eighth Amendment, or that single-celling was required to remedy that violation. Rather, the court's June 22, 1984 decree appears to be no more than a renewed attempt to enforce its 1976 remedial order, which it views as "the law." That rigid approach, with its attendant sanctions, is untenable.

■ The "law of the case" doctrine has no application in the instant case.[12] The "one man, one cell" standard is not an immutable principle engraved in stone but simply a judicial response made nine (9) years ago to then-intolerable conditions. The underlying basis of that response, moreover, has in large part evaporated. The record reveals that the Court of Common Pleas derived the "one man, one cell" theory from statutes which are no longer in force.

The single-celling of inmates in the Philadelphia prison system was initiated in 1790. *See* Act of April 5, 1790, 2 Sm.L. 531; *Pember's Case,* 1 Wharton 439 (1836). The legislature reasoned that "the addition of unremitted solitude to laborious employment, as far as it can be effected, [would] contribute as much to reform as to deter...." Act of April 5, 1790, *supra* at § 1. The statutory single-celling requirement continued well into the twentieth century. *See* Act of April 8, 1851, P.L. 353, § 1, 61 P.S. § 422 (1964) (repealed 1981); Act of March 30, 1831, P.L. 228, § 8 (1964) (repealed 1981); Act of May 13, 1931, P.L. 121, § 4, 53 P.S. § 13644 (1957) (repealed 1981). Similar provisions were made for detainees. *See* Act of April 14, 1835, P.L. 232, § 11, 61 P.S. § 634 (1964) (repealed 1978); Act of July 19, 1917, P.L. 1117, § 4, 61 P.S. § 784 (1964) (repealed 1981). The lower court's formulation of the "one man, one cell" principle is grounded primarily on the existence of these

---

**12.** The doctrine of "law of the case" is well established:

It is hornbook law that issues decided by an appellate court on a prior appeal between the same parties becomes the law of the case and will not be reconsidered on a second appeal. See: *Delaware River Port Authority v. Pa. P.U.C.,* 408 Pa. 169, 182 A.2d 682 (1962); *Ondovchik v. Ondovchik,* 421 Pa. 20, 218 A.2d 478 [578] (1966). *Commonwealth v. Tick, Inc.,* 431 Pa. 420, 427, 246 A.2d 424, 427 (1968).

*See also Commonwealth by Truscott v. Binenstock,* 366 Pa. 519, 77 A.2d 628 (1951); *Casari v. Victoria Amusement Enterprises, Inc.,* 339 Pa. 342, 14 A.2d 92 (1940); *Creachen v. Bromley Brothers Carpet Co.,* 214 Pa. 15, 63 A. 195 (1906); *Cowen v. Pennsylvania Plate Glass Co.,* 188 Pa. 542, 41 A. 615 (1898). It must be emphasized that the doctrine applies only to the rulings of an appellate court. *Filanowski v. Zoning Board of Adjustment,* 439 Pa. 360, 266 A.2d 670 (1970); *Kuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897 (1966); *Brown Estate,* 408 Pa. 214, 183 A.2d 307 (1962).

statutes. *See Jackson v. Hendrick,* No. 2437 February Term, 1971 (Phila.C.C.P. March 17, 1981) slip op. at 9, 16. All of these statutes were repealed by the Act of July 10, 1981, P.L. 218, No. 68, § 1, 61 P.S. 2191 (Supp.1985), to the extent that they required the separation of prisoners, with the exception of the Act of April 14, 1835, which was repealed in its entirety by the Act of October 4, 1978, P.L. 909 No. 173 § 9. Thus the support originally identified for the "one man, one cell" standard no longer exists.

In this matter we limited our review solely to whether a "one man, one cell" requirement is constitutionally mandated. Since we heard this matter as a result of the exercise of extraordinary jurisdiction and not by way of an appeal of a final adjudication below, the cause is still pending and there remain issues involving resolutions of fact which are best determined by the Court of Common Pleas.[13] Accordingly, the cause is remanded with the clarification provided herein.[14]

ZAPPALA and PAPADAKOS, JJ., each files a dissenting opinion.

ZAPPALA, Justice, dissenting.

While I agree with the legal analysis employed by the Majority Opinion with regard to the proper standard involved in adjudging whether the overcrowding of a prison amounts to cruel and unusual punishment, I must dissent.

---

**13.** We limited our jurisdiction in this appeal to the "one man, one cell" issue and confined the arguments of the parties thereto, therefore we cannot make a final determination as to any of the other matters involved in the June 22, 1984 order, *see supra* n. 5, without affording the parties the opportunity to first raise those additional issues in the Court of Common Pleas. Moreover, in view of the nature of the subject matter, the fact that this cause has existed to date fourteen years is not of serious significance. Any change of circumstance which may occur requires a continuing review of equitable degrees which are designed to apply over a long period of time.

**14.** This Court's Order of October 17, 1984 is to remain in full force and effect pending further review by the court below in accordance with this opinion.

The basis of my dissent is the propriety of remanding this matter to the Court of Common Pleas. As the Majority aptly sets forth, this case has been in litigation for over fourteen years. In that time a more than ample record has been produced from which we can evaluate and determine a constitutional violation. My review of the record indicates that although a constitutional violation may have been present at the inception of this litigation, as the matter now stands, it is clear that the conditions of the prison system do not reach constitutional infirmity. Accordingly, I see no basis or necessity for remanding this matter for further proceedings.

PAPADAKOS, Justice, dissenting.

I dissent. The majority's ruling that the doctrine of "law of the case" is inapplicable is incorrect. Furthermore, to remand this matter for additional proceedings after fourteen years of litigation is an injustice to society and our judicial system as a whole.

It is undisputed by the parties that "totality of the circumstances" is the correct standard to be applied in determining whether prison populations rise to the level of cruel and unusual punishment. The majority has wrongly chosen to believe Appellants' version of the basis for the June 22, 1984, order which imposed a population cap on inmate population: that it is based on a "one man, one cell" principal, and that no constitutional or statutory basis exists for the decision. Appellees' contention that the trial court, in all the hearings and opinions herein, applied a "totality of the circumstances" standard for the purpose of alleviating unconstitutional conditions is supported by the record. Appellants' contention that the "one man, one cell" standard was applied is in error.

Further, I must agree with Appellees that the "one man, one cell" occupancy limit does not require a constitutional or statutory basis, because the trial court order is the "law

of the case." The order, which eliminated an unconstitutional condition of confinement, is well within the powers of the trial court. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

Although the majority concedes "it is hornbook law that issues decided by an appellate court on a prior appeal between the same parties become the law of the case and will not be reconsidered on a second appeal," and that the doctrine applies only to appellate court rulings, my brethren are incorrect in holding no appellate review of this standard has been previously undertaken.

Through the fourteen year history of this controversy, this Court has issued seven (7) orders, and Commonwealth Court has issued orders in eight (8) instances. These orders range from stays, to denial of a petition for allowance of appeal, to full adjudication resulting in opinions from this Court and Commonwealth Court. Throughout this lengthy history, appellate courts have continually upheld the equitable powers of the trial court in their attempts to implement a structured population cap in the prison systems.

Thus, the instant action has produced fifteen (15) appellate orders. Regardless of whether the standard was explicitly reviewed through these multitudinous appellate appearances, it is time to end this litigation. The majority's statement that no appellate ruling exists in this case on the question of a statutorily or constitutionally required "one man, one cell" standard should not be the basis for our opinion or a remand order. The record discloses a "totality of the circumstances" argument was employed in the decision to implement a population cap among the inmates. This fact alone is sufficient for our Court to exercise a "hands off" policy, particularly where the trial court has dealt very competently in handling the inadequate conditions of the prison system.

I would affirm the trial court's order and put a stop to this senseless litigation.