Gerald JACKSON, a/k/a Gerald Day, Charles S. Beaufort, Emanuel Gardner, Anthony Sanders, a Minor, by Alice Sanders, his guardian, and William Respass, on behalf of themselves and all others similarly situated,

v.

Edward J. HENDRICK, individually and as Superintendent of Philadelphia Prisons, James H.J. Tate, individually and as Mayor of the City of Philadelphia, Paula D'Ortona, William F. Boyle, Edgar C. Campbell, Sr., Edward R. Cantor, Thomas M. Foglietta, John B. Kelly, Jr., W. Thacher Longstreth, William J. Cottrell, William A. Cibotti, Charles L. Durham, George X. Schwartz, Thomas McIntosh, Joseph L. Zazyczny, Harry P. Jannotti, David Cohen, Isadore H. Bellis, David Silver, Individually and as members of the City Council of the Philadelphia Randolph E. Wise, individually and as Welfare Commissioner, Daniel B. Michie, Jr., Paul A Rafferty, Charles P. Mirarchi, Jr., Arthur W. Thomas, A. Charles Peruto, individually and as members of the Board of Trustees of Philadelphia Prisons, Joseph P. McGowan, Warden of Holmesburg Prison, John B. McGuire, Warden of Eastern State Penitentiary, Patrick M. Curran, Warden of the Detention Center Louis S. Aytch, Warden of the House of Correction, City of Philadelphia,

City of Philadelphia, Appellant.

Commonwealth Court of Pennsylvania.

Argued Oct. 3, 2000.
Decided Nov. 21, 2000.
As Amended Dec. 8, 2000.
Reargument Denied Jan. 31, 2001.

Marcia Berman, Philadelphia, for appellant.

David Rudovsky, Philadelphia, for appellees.

BEFORE: FRIEDMAN, Judge, FLAHERTY, Judge and NARICK, Senior Judge.

FRIEDMAN, Judge.

The City of Philadelphia (City) appeals from the October 1, 1996 order of the Court of Common Pleas of Philadelphia County (trial court), which was reinstated and amended by an order of the trial court dated March 7, 1997. The trial court's October 1, 1996 order, as amended, found the City in contempt for failure to comply with a September 6, 1991 consent decree (Consent Decree), and subsequent stipulations, governing conditions in the City's prison system and ordered the City to pay monetary sanctions for its noncompliance. We affirm.[1]

The tangled history of this case spans almost thirty years, and a brief history of the litigation is important to an understanding of the current appeal. In 1971, five prisoners in the City's prison system (Prisoners) filed a class action suit in equity in the trial court against City officials; the Prisoners sought injunctive relief from conditions of confinement alleged to violate the Prisoners' constitutional and statutory rights. *Jackson v. Hendrick*, 509 Pa. 456, 503 A.2d 400 (1986). In 1972, the trial court held that the Prisoners' conditions of confinement violated their constitutional and statutory rights and amounted to cruel and unusual punishment under the federal and state constitutions. *Id.* The trial court ordered the City to take immediate action to improve prison conditions. *Id.*

Subsequently, the parties entered into a series of consent decrees that set forth measures for the City to take to provide for constitutionally adequate living conditions, services and programs for inmates in the City's prison system. The parties are currently bound by the 1991 Consent Decree, which imposes obligations on the City with respect to virtually every aspect of prison life and empowers the trial court to impose monetary fines for noncompliance.[2]

On November 9, 1995, the Prisoners filed a motion for contempt of court that triggered the instant dispute.[3] Following

1. Senior Judge Charles P. Mirarchi, Jr. did not participate in this decision.

2. In 1986, our supreme court, noting the long period of time that had elapsed since the initial findings of unconstitutional conditions in the prison system, remanded the Prisoners' case to the trial court and ordered a new hearing on the status of the City's prison conditions. *Jackson.* On remand, the parties negotiated a new consent decree, entered August 4, 1988. Subsequent to the August 4, 1988 consent decree, the Prisoners filed a contempt petition, and, on July 29, 1990, the trial court held the City in contempt. The City filed a notice of appeal, but, upon further negotiation, the parties entered into an Amended Agreement of Settlement which the trial court approved on September 6, 1991 (Consent Decree), (R.R. at 12a–82a); the City subsequently withdrew its appeal. The September 6, 1991 Consent Decree has governed this case since that date.

3. This was one of many such motions. Previously, on March 23, 1993, the Prisoners filed a motion for contempt, complaining that the City was in violation of the Consent Decree. The trial court found the City in contempt and ordered the City to pay a $1,220,000 fine. (R.R. at 96a.) On October 20, 1994, the Prisoners again filed a motion for contempt. As a result, the parties entered into the Stipulation of January 6, 1995, wherein the City admitted that it was not in full compliance with certain provisions of the Consent Decree. (R.R. at 97a.) In February 1995, the Prisoners filed another motion for contempt; the Stipulation filed on May 18, 1995 resulted. (R.R. at 104a.) On March 20, 1995, the trial court held the City in contempt for violations relating to the October 20, 1994 motion for contempt and imposed a $701,500 fine. The City filed a Motion for Reconsideration of the trial court's contempt adjudication, but withdrew the motion in connection with a third stipulation agreement, the Stipulation of August 22, 1995. (R.R. at 108a.) The Stipulation of August 22, 1995 provided that "[I]f the City is not in full compliance with the provisions of the Consent Decree and Stipulation of January 17, 1995 by October 1, 1995, [the Prisoners] will seek the liquidated damages for each

hearings on the motion, the trial court found the City to be in contempt for failing to comply with the Consent Decree and, by its October 1, 1996 order, fined the City $2,252,500. (R.R. at 890a.) The City filed a Motion for Reconsideration, and, in response thereto, the trial court vacated the October 1, 1996 order. After reconsideration, the trial court issued its March 7, 1997 order, reinstating and amending the October 1, 1996 order and decreasing the fine to $2,095,000. (R.R. at 922a.)

■ On March 13, 1997, the City filed an appeal with this court, (R.R. at 924a); however, this court quashed the appeal for lack of jurisdiction on March 27, 1998. Then, on February 22, 2000, the Pennsylvania Supreme Court vacated this court's order and remanded the case for consideration of the merits of the City's appeal.[4]

### I. Civil or Indirect Criminal Contempt

The City first argues that the trial court imposed an indirect criminal contempt fine, rather than a civil contempt fine, and, therefore, the City was entitled to all the safeguards of a criminal proceeding.[5] We do not agree that the trial court imposed a criminal sanction here.

■ The courts have always possessed inherent powers to enforce their orders and decrees by imposing sanctions. *Borough of Beaver v. Steckman*, 728 A.2d 418 (Pa.Cmwlth.1999) (emphasis added) (citing *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (1968)).

If the dominant purpose of the court is remedial, to coerce compliance with the court's previous order and in some cases *to compensate the complainant for losses suffered*, the contempt proceeding is classified as *civil*. If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public by punishing the contemnor, the proceeding is for criminal contempt. Criminal contempt is a crime, and those accused of indirect criminal contempt, that which is committed outside the presence of the court, are provided with safeguards according to statute and to normal criminal procedures.

*Id.* at 421 (citations omitted) (emphasis added). The key to determining whether a contempt sanction is criminal or civil is the character of the sanction. *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). If the sanction is a fine, it is remedial when it is paid to the complainant and punitive when it is paid to the court. *Id.*

■ Here, the trial court's order requires the City to pay its fine to the trial court. However, the long history of this case shows clearly that the trial court will hold the fine monies for the benefit of the Prisoners. Indeed, one of the purposes of the 1991 Consent Decree was "to provide a rational and effective system for disbursement of monies accumulated by the [trial] [c]ourt from the City." (R.R. at 15a.) Moreover, the August 22, 1995 stipulation refers to a grant from the trial court's

---

day of non-compliance." (R.R. at 111a.) The November 9, 1995 motion for contempt at issue here followed. The Prisoners filed a supplemental motion for contempt on February 12, 1996. (R.R. at 139a.)

**4.** Our scope of review when considering an appeal from a contempt order is limited to a review of whether the trial court abused its discretion or committed an error of law. *Richland Township v. Prodex, Inc.*, 166 Pa. Cmwlth. 313, 646 A.2d 652 (1994). When considering an appeal from a contempt order, great reliance must be placed upon the discretion of the trial judge. *Fenstamaker v. Fensta-*

*maker*, 337 Pa.Super. 410, 487 A.2d 11 (1985).

**5.** The Prisoners contend that the City has waived all of the issues raised here because the City failed to raise them before the trial court in its motion for reconsideration. However, failure to preserve an issue in a motion for reconsideration will *not* result in a waiver of that issue. 1 G. Ronald Darlington, et al., Pennsylvania Appellate Practice 2d § 302:59 (1999) (citing *City of Philadelphia v. Tasker*, 119 Pa.Cmwlth. 519, 547 A.2d 1261 (1988)).

"Escrow Fund" for the expansion of vocational training opportunities. (R.R. at 109a.) Because there is no reason to doubt that the trial court will place the money in its Escrow Fund for the benefit of the Prisoners, as it has in the past, we conclude that the fine is compensatory and remedial, and, therefore, it is a civil sanction.[6]

## II. Burdens of Proof

### 1. Full or Substantial Compliance

The City argues that the trial court erred in requiring the City to be in full compliance, instead of substantial compliance, with the Consent Decree because substantial compliance is all that is required by the January 17, 1995 stipulation. (*See* R.R. at 97a–103a.)

▪ We begin our analysis of this issue by pointing out that the trial court imposed civil contempt fines for *two* violations of the January 17, 1995 stipulation. The first violation was the City's failure to provide sufficient social workers to comply with the provisions of the Consent Decree. (R.R. at 921a.) In the August 22, 1995 stipulation, the City agreed that it would be subject to a fine for contempt if it were not in "full compliance" with the Consent Decree and the January 17, 1995 stipulation with respect to social services. (R.R. at 110a–11a.) Therefore, it is clear that the trial court did not err in requiring full compliance instead of substantial compliance in this regard.

6. The City contends that the fine is not compensatory because it was not based on any estimate of damages. However, the City stipulated that the potential penalties in this case constitute liquidated damages, and the fine was based on that stipulation. (*See* R.R. at 111a.) Therefore, we are not persuaded by this argument.
  The City also contends that the trial court did not give the City an opportunity to purge the contempt and reduce or avoid the fine through future compliance. However, this is not necessary when the sanction is compensatory. *See International Union, United Mine*

The second violation of the January 17, 1995 stipulation was the City's failure to provide the Prisoners with sufficient clothing, supplies and laundry access. (R.R. at 921a.) We agree with the City that, in this instance, the City was subject to a fine for contempt if it was not in "substantial compliance" with the Consent Decree. (R.R. at 101a.) However, our reading of the trial court's adjudication indicates the trial court found that the City was not in *substantial* compliance with the Consent Decree with respect to personal supplies.

The trial court found that: (1) "the large majority of inmates did not have the required two sets of blues (prison clothing), sheets or pillow cases," (Findings of Fact, No. B(4)); (2) "the majority of inmates did not have access to adequate laundry facilities to wash their clothing, sheets, pillow cases or towels," (Findings of Fact, No. B(5)); and (3) "the City admitted the seriousness of this problem," (Findings of Fact, No. B(6)). If a large majority, or a majority, of inmates lacked the required personal supplies and if the City acknowledged it was a serious problem, then the City did *not* substantially comply with the Consent Decree or the January 17, 1995 stipulation. We conclude, then, that the trial court did not err by requiring full compliance with the Consent Decree when the January 17, 1995 stipulation only required substantial compliance.

### 2. Preponderance of the Evidence

The City next argues that the trial court erred in finding that the Prisoners proved noncompliance with the Consent Decree by a preponderance of the evidence.[7] In par-

*Workers of America v. Bagwell,* 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

7. *See Borough of Beaver v. Steckman,* 728 A.2d 418 (Pa.Cmwlth.1999) (stating that complainants in a contempt proceeding must prove their case by a preponderance of the evidence); *see also Commonwealth v. $23,320.00 U.S. Currency,* 733 A.2d 693 (Pa.Cmwlth. 1999) (stating that the preponderance of the evidence standard requires only that a burdened party prove that its credible evidence outweighs that of the defending party).

ticular, the City contends that the trial court erred in relying on the testimony of a handful of inmates and social workers for its findings about (1) the City's failure to provide the required prison clothing to all inmates and (2) the City's failure to ensure a 72–hour response time to all social services requests. We disagree.

■ With respect to the City's failure to provide the required prison clothing to all inmates, the trial court did not rely solely on the testimony of a few inmates. First, in the January 17, 1995 stipulation, the City acknowledged that it was not in substantial compliance as of that date. (R.R. at 97a.) Second, Robert W. Powitz, a sanitarian who had performed extensive inspections of the environmental health, safety and security of the City's prison facilities, gave expert testimony on the matter. (R.R. at 386a.) Powitz testified that: (1) in July 1995, "most of the inmates [at the City's Detention Center] . . . were only issued one set of [the] uniform [referred to as 'blues']" instead of the required two sets, (R.R. at 392a); (2) in January 1996, there was still a problem with the "availability of prison-issued clothing," (R.R. at 414a–15a); and (3) as of March 19, 1996, the day before Powitz gave his testimony, there were no changes with respect to prison clothing, (R.R. at 422a–23a). Third, the City admitted in a post-trial affidavit that, after Powitz testified, additional sets of clothing were distributed to inmates in five different correctional facilities. (R.R. at 307a.)

Given such evidence, we conclude that the trial court did not err in finding the Prisoners proved by a preponderance of the evidence that the City was not in substantial compliance with the clothing re-quirements. Based on the evidence of record, it is more likely than not that, for more than a year, the City failed to provide all inmates with the required clothing.[8]

■ As for the City's failure to ensure a 72–hour response time to all social services requests, the Prisoners presented the testimony of two social workers. The City stipulated that three other social workers would testify in accord with the testimony of these two.[9] (R.R. at 235a.) Louis Soto, shop steward at the City's House of Corrections for the social workers union, testified based on his own experience and the experience of those social workers in his office that social workers are able to respond to social service requests within 72 hours only 25 to 30 percent of the time. (R.R. at 330a, 333a, 338a–39a.)

We point out that the City had to be in *full* compliance with the 72–hour response time requirement. Thus, if even one social worker testified credibly that he or she failed to meet the 72–hour response time, the Prisoners proved by a preponderance of the evidence that the City failed to comply with the Consent Decree. Obviously, then, we conclude here that the trial court did not err in finding that the Prisoners proved noncompliance with the 72–hour response time requirement by a preponderance of the evidence.

**C. Arbitrary Maximum Fines**

■ The City next argues that the trial court abused its discretion because it imposed the maximum fines allowed by the January 17, 1995 stipulation without stating its reasons for doing so. The January 17, 1995 stipulation provides that the City

8. A party may prove a case by circumstantial evidence. 8 Standard Pennsylvania Practice 2d § 49:15 (1999). In such instances, proof is given of facts and circumstances from which the finder of fact may infer other connected facts that reasonably follow. *Id.* Here, the Prisoners, an impartial inspector and the City *all* indicated that there was a widespread clothing problem during 1995 and 1996. The Prisoners did not have to present the testimo-ny of every prisoner in the Philadelphia prison system to establish the number of inmates who lacked the required clothing and the exact number of days involved.

9. The five social workers represented four different correctional facilities. (*See* R.R. at 235a, 666a–67a.)

may be fined "up to $1500 per day" if the City is not in compliance with respect to social services and personal supplies.[10] (R.R. at 99a–101a.)

Although the City claims it is unable to determine the trial court's reason for imposing the maximum allowable fine, the trial court's reason is apparent to us. The trial court states that the Philadelphia prisons "remain dangerously overcrowded, while conditions remain, in many respects, cruel, disgusting and degrading." (Trial court op. at 1.)

> Half-hearted measures, or sham claims of compliance do not address the problems [or] conditions within the prisons, and are inadequate to satisfy the agreements which the City has made. Plainly, both [the Prisoners] and the [trial court] have given the City *numerous opportunities to honor their commitments.* Indeed, the City has repeatedly opted to pay a fine for contempt rather than comply with its [trial court] approved agreements.

> It is not our desire to denigrate or dishearten the City as to those areas where there has been compliance with agreements made here and in Federal Court. However, because we have concluded that the below discussed defaults are due to *a failure of will* on the part of the City, we must, yet again, attempt to coerce compliance with a finding of contempt and appropriate sanctions.

(Trial court op. at 1–2.) (Emphasis added.) Quite obviously, the trial court imposed the maximum penalty because it found that, despite many opportunities to satisfy the requirements of the Consent Decree in the areas that concerned the trial court here, the City preferred simply to pay a fine and allow the "cruel, disgusting and degrading" conditions to continue.

■ The City also believes that the trial court abused its discretion by imposing a $1 million lump sum fine for noncompliance with respect to (1) environmental conditions at the Detention Center,[11] (2) vocational training and (3) adequate correctional staffing. We disagree. The City acknowledges that the trial court had authority pursuant to section II(I) of the Consent Decree to impose a fine of up to $20,000 per day for noncompliance. (*See* R.R. at 17a.) Here, we estimate that the $1,000,000 lump sum constitutes less than $1000 per day for each of the three Consent Decree violations.[12] Certainly, this is not an abuse of discretion when the trial court could have imposed a $20,000 per day fine for each violation.

### D. Consent Decree Interpretation

Finally, the City argues that the trial court misinterpreted various provisions of the Consent Decree and, in doing so, imposed conditions on the City that the City did not accept.

---

**10.** The City argues that the trial court should not have imposed a fine for the entire 365 days covered by the August 22, 1995 stipulation. The City contends that there was a 60 day grace period, during which it was not subject to penalties. (City's brief at 38 n. 13.) We disagree. The August 22, 1995 stipulation states that, if the City is not in compliance with the Consent Decree, Prisoners will seek liquidated damages for "each day of noncompliance" with the January 17, 1995 stipulation. (R.R. at 111a.) In other words, according to the stipulation, there would be *no* grace period if the City failed to come into compliance within 60 days. Because the City did not come into compliance within 60 days of the stipulation, the City was subject to a

penalty for the entire period of noncompliance.

**11.** The trial court found environmental violations at the institution as of May 1995 and continuing violations during the period from July 1995 to March 1996. (*See* Trial court's Findings of Fact, No. D(3)-D(4); *see also* May 18, 1995 stipulation, R.R. at 104a–07a.)

**12.** We divide the $1,000,000 by three because the lump sum covers three violations of the Consent Decree. The result is approximately $333,000 per violation. To obtain a conservative estimate of $1000 per day, we divide the $333,000 by 333 days.

### 1. Correctional Officer Staffing

The City contends that the trial court misunderstood the correctional officer staffing requirements set forth in section III(N) of the Consent Decree. The City maintains that section III(N) authorizes a penalty against the City only if the City fails to employ at least 1,330 correctional officers in the Philadelphia prisons. We believe that the City has misunderstood the trial court's decision with respect to correctional officer staffing.

The trial court found that the City had an obligation under the Consent Decree to provide various inmate services and programs, including law library access, family visits, telephones and recreation. (Findings of Fact, No. C(1).) The trial court also found that the City has a history of denying inmates these required services because of correctional officer staffing shortages. (Findings of Fact, No. C(2).) Based on these findings, the trial court concluded that the City violated sections III(L), (N),[13] (S), (T) and (Y) of the Consent Decree because the City failed to provide law library access, family visits, telephones and recreation due to insufficient correctional officer staffing. (Conclusions of Law, No. 2(c).)

The trial court was authorized to fine the City up to $20,000 per day for failure to provide the services and programs required by the Consent Decree. (R.R. at 17a.) That is what the trial court did here. The trial court did *not* fine the City for failure to employ 1,330 correctional officers. Therefore, the City cannot prevail on this argument.

### 2. Social Services

The City next contends that the trial court misunderstood the social services caseload provisions in section III(O) of the Consent Decree. The City points out that these provisions "are intended to establish social service caseloads only at institutions currently subject to maximum allowable population [MAP] orders of the court in *Harris v. Reeves* [761 F.Supp. 382 (E.D.Pa.1991)]." (R.R. at 57a.) The City asserts that the new Curran–Fromhold Correctional Facility (CFCF) was not "currently subject" to the MAP orders of the *Harris* court when the Consent Decree was executed; therefore, the trial court erred in considering evidence about social services at that facility.

Section III(O)(1) of the Consent Decree states that no social worker may carry a caseload of more than 100 inmates. (R.R. at 56a.) Even if the trial court erred in considering social worker caseloads at CFCF, the evidence of record demonstrates clearly that the City was not in full compliance with this requirement. (*See* R.R. at 666a–82a.) Therefore, we shall not consider this issue further.

### 3. Laundry Access

■ The City also argues that the trial court erred in imposing a contempt sanction upon the City because of insufficient laundry access. (Trial court's 3/7/97 order, para. 1(a)(ii).) The City claims that the Consent Decree does not require that the City provide sufficient laundry access to inmates. We disagree.

Section III(G) of the Consent Decree states that, upon admission, the City shall provide each inmate with two shirts, two pants, two *clean* sheets, a *clean* pillow case and other supplies. In addition, section III(G) provides that, on a bi-weekly basis, the City shall canvass each living area and replace any missing items within forty-eight hours. (R.R. at 33a–34a.) Powitz, the inspector, testified that inadequate laundry facilities caused a problem with the redistribution of supplies at one facility. (R.R. at 415a.) Thus, the City cannot provide clean clothing or clean bedding as

---

**13.** Section III(N)(4) states that it is the intent of the parties that the City provide sufficient correctional officers to allow delivery of the services and programs required by the Consent Decree. (R.R. at 54a.)

required by the Consent Decree if the laundry facilities are inadequate.

Section III(E)(1)(g) of the Consent Decree states that medical personnel shall work in "clean, safe areas...." (R.R. at 28a.) Powitz testified that the lack of adequate laundry facilities caused a problem with infectious linens in the hospital of the Detention Center. (R.R. at 405a.) Thus, the City cannot provide a clean and safe area for the medical staff if there are not sufficient laundry facilities to clean bloody and infectious linens in the hospital.

Section III(V)(3) of the Consent Decree requires that the City provide functioning sinks and drains. (R.R. at 63a.) Powitz testified that, because the laundry facilities are inadequate, the inmates do their laundry in the sinks and showers with lye soap, which causes drainage problems. (413a–14a.) Thus, absent adequate laundry facilities, the City cannot provide the inmates with functioning sinks and drains, as required by the Consent Decree.

Because it is apparent from the record that the City cannot meet the requirements of the Consent Decree without adequate laundry facilities, we conclude that the trial court did not err by imposing a contempt sanction for insufficient laundry facilities.

### 4. Vocational Training

Finally, the City argues that the trial court misunderstood the vocational training provisions in section III(Q) of the Consent Decree. The City contends that inmates who work in laundry and kitchen positions receive vocational training as contemplated by the Consent Decree. Therefore, the trial court should have counted those jobs as vocational training positions. We disagree.

Section III(Q)(1) of the Consent Decree states: "The [City] shall provide a minimum of 800 placements in vocational training programs.... These programs may include ... laundry and dry cleaning oper-

ations ... and other programs *designed to teach marketable skills.*" (R.R. at 58a) (emphasis added).

Here, the trial court found that laundry workers do nothing more than place clothes in washing machines and dryers [14] and that the vast majority of inmates in kitchen and food delivery do nothing more than serve food to inmates and clean the work areas. (Trial court's Findings of Fact, Nos. E(5), E(6)-E(7).) These positions do not teach marketable skills to the inmates. In fact, the positions described by the trial court are unskilled positions. Therefore, the trial court did not err by excluding them from the required number of vocational training positions.

Accordingly, we affirm.

### ORDER

AND NOW, this 21st day of November, 2000, the October 1, 1996 order of the Court of Common Pleas of Philadelphia County (trial court), as amended by the trial court's March 7, 1997 order, is hereby affirmed.

14. This is not the same as learning "laundry and dry cleaning operations."