**COMMONWEALTH of Pennsylvania By Michael FISHER, in his official capacity as Attorney General of the Commonwealth of Pennsylvania**

v.

**PHILIP MORRIS, INC.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T. Industries, P.L.C.; The American Tobacco Company, Inc. c/c Brown & Williamson Tobacco Corporation;**

---

Lorillard Tobacco Company; Liggett Group, Inc.; United States Tobacco Company; the Tobacco Institute, Inc.; The Council for Tobacco Research– U.S.A., Inc.; Smokeless Tobacco Council Inc.; and Hill and Knowlton, Inc.

**Appeal of: R.J. Reynolds Tobacco Company.**

Commonwealth Court of Pennsylvania.

Argued June 24, 2010.
Decided Aug. 17, 2010.
Reargument Denied Oct. 13, 2010.*

---

* Leavitt and Brobson, JJ., did not participate in  this decision.

David T. Miller, Carlisle, for appellant.

Carly J. Wismer, Deputy Attorney General, Joel M. Ressler, Chief Deputy Attorney General, and Alexis L. Barbieri, Executive Deputy Attorney General, Harrisburg, for appellee, Commonwealth of Pennsylvania.

BEFORE: PELLEGRINI, Judge, and McCULLOUGH, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge PELLEGRINI.

R.J. Reynolds Tobacco Company (Reynolds) appeals from an order of the Court of Common Pleas for Philadelphia County (trial court) finding it violated the Tobacco Master Settlement Agreement and was in contempt of court for violation of the Consent Decree because it used cartoons in the promotion and advertising of its tobacco products. Because the trial court erred in determining Reynolds was liable for a third-party's use of cartoons in an independently produced editorial and that Reynolds' own advertisements included cartoons, we reverse.

In 1997, the Commonwealth of Pennsylvania commenced suit against several major tobacco manufacturers, including Reynolds, as part of a nationwide litigation strategy to, *inter alia,* recover medical expenses resulting from tobacco-related diseases and halt the marketing of tobacco products to minors. In November of 1998, the Commonwealth and 45 other states entered into a Master Settlement Agreement (MSA) and Consent Decree with Reynolds which prohibited the manufacturer from "using or causing to be used within the Commonwealth of Pennsylvania any Cartoon in the advertising, promoting, packaging or labeling of Tobacco Products." (Consent Decree § V(B)). The MSA defined "Cartoon" as follows:

"Cartoon" means any drawing or other depiction of an object, person, animal, creature or other similar caricature that satisfies any of the following criteria: (1) the use of comically exaggerated features; (2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or (3) the attribution of unnatural or extra-human abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation. The term "Cartoon" includes "Joe Camel."

(MSA § II(1)).

Beginning in 2007, while still subject to the MSA and Consent Decree, Reynolds engaged in an advertising campaign known as the *Camel Farm* which sought to promote independent rock music and record labels in connection with its Camel® cigarette brand. The *Camel Farm* campaign used an agricultural theme which depicted the growth and nurturance of independent music rising from the underground. The campaign included a multi-page butterfly or barn door gatefold advertisement[1] in *Rolling Stone* magazine's 40th Anniversary issue published on November 15, 2007.[2] The gatefold was spread out over nine pages with *Camel Farm* ads on pages one, three, four and nine and a *Rolling Stone*

---

1. The barn door gatefold advertisement consisted of four pages of advertising which surrounded and opened up to five pages of editorial content. It began with a lead-in page of *Camel Farm* advertising followed by one page of editorial content. This was followed by two opposing pages of advertising, which opened up to a four-page foldout containing solely editorial content. The final page consisted of a lead-out *Camel Farm* ad.

2. In addition to this gatefold advertisement, Reynolds also sponsored live music performances across the country, distributed a compact disc with music from the sponsored performers, and launched a *Camel Farm* website promoting "free range" music. While the trial court's opinion in this case applied to the content on the website and compact disc, it did not find any links between Reynolds' alleged violation and the goal of the cartoon ban—prohibiting marketing to minors—because Reynolds made reasonable efforts to restrict access to the website and compact disc to persons of legal age. In addition, Reynolds closed the website in 2007 as a result of this litigation.

editorial entitled "Indie Rock Universe" covering pages two and five through eight. The latter pages were wrapped in the gatefold *Camel Farm* ad.

The *Camel Farm* advertisements consist of actual photographs of plants, birds, farm animals, farm equipment, televisions, speakers and radios arranged in a retro-styled collage. While most of the images are typical photographs, the ad does contain an image of a radio with a propeller flying through the air and several radios, televisions and speakers perched on stems as if growing out of the ground. It also contains printed type explaining the *Camel Farm* concept, the Camel® logo, and mandatory Surgeon General's Warnings. The *Rolling Stone* editorial, on the other hand, consists of hand-drawn illustrations of rockets, alien creatures, robots, a planet with a mouth and arms, a kilted headless man with bagpipes protruding from his side, and a rocket-powered guitar. While the parties disagree as to whether the images in Reynolds' *Camel Farm* ad constitute cartoons under the MSA definition, they agree that many of the *Rolling Stone* editorial images clearly meet the MSA definition of cartoons.

After the magazine was published, the Commonwealth filed a Motion to Enforce the Consent Decree with the trial court and sought monetary sanctions arguing that the images in the *Camel Farm* ads constituted cartoons and that Reynolds was liable for the cartoons contained within the adjacent *Rolling Stone* editorial. Eight other states which signed the MSA instituted similar lawsuits.[3] Reynolds ar-

---

**3.** The Attorney Generals in Maine, California, Ohio, Washington, Illinois, New York, Maryland, and Connecticut all instituted lawsuits alleging Reynolds violated the MSA and Consent Decrees with their states because the *Camel Farm* ad contained cartoons and Reynolds was liable for the cartoons contained in the *Rolling Stone* editorial. The Superior Court of Maine held that the images contained in Reynolds' *Camel Farm* ad were not cartoons and Reynolds did not use or cause cartoons to be used in the editorial. *State v. R.J. Reynolds Tobacco Co.*, No. CV–97–134 (Kennebec Super.Ct. Jan. 21, 2009). The Superior Court of California found that Reynolds did not use or cause cartoons to be used in the editorial but some of the images in its own *Camel Farm* ads were prohibited cartoons. *State v. R.J. Reynolds Tobacco Co.*, No. D055350 (San Diego Cty.Super.Ct. Apr. 20, 2009). The court stated that images of a flying radio and a jet-powered tractor violated the third prong of the MSA definition because they attributed unnatural abilities to these objects. However, the court declined to award monetary sanctions against Reynolds because the violation was minor and unintentional, and the state was unable to quantify actual damages. Reynolds appealed and the Court of Appeal affirmed. *In re Tobacco Cases I,* 186 Cal.App.4th 42, 111 Cal.Rptr.3d 313 (2010). The Court of Common Pleas, Franklin County, Ohio held that Reynolds' *Camel Farm* ads did not include cartoons. *State v. R.J. Reynolds Tobacco Co.*, No. 97CVH05–5114 (Franklin Cty.Ct.Com.Pl. July 30, 2008). However, it held that Reynolds used or caused cartoons to be used in the *Rolling Stone* editorial "because it was so intertwined with the Camel brand advertisement that it was used to promote Camel cigarettes" and because Reynolds failed to take reasonable steps to avoid violating the Consent Decree. Reynolds appealed and the Court of Appeals of Ohio reversed the lower court's ruling that Reynolds was liable for the editorial content because it did not engage in affirmative conduct that could be considered using or causing cartoons to be used. *State v. R.J. Reynolds Tobacco Co.*, 2010 WL 154720 (Ohio Ct. App. Jan. 14, 2010). The Supreme Court of Ohio declined jurisdiction to hear the case. The Superior Court of Washington for King County concluded that Reynolds did not violate the Consent Decree because it did not use or cause cartoons to be used in the editorial and the images in its *Camel Farm* ad did not constitute cartoons. *State v. R.J. Reynolds Tobacco Co.*, No. 96–2–15056–8 SEA (King Cty.Super.Ct. June 2, 2008). The State appealed and the Washington Court of Appeals affirmed the ruling that Reynolds did not violate the MSA by failing to prevent *Rolling Stone* from using cartoons in its editorial. *State v. R.J. Reynolds Tobacco Co.*, 151 Wash.

gued that the images in its advertisements were not cartoons and the pages which did contain cartoons were editorial content of *Rolling Stone* unconnected to the *Camel Farm* ads for which Reynolds bore no responsibility.

The trial court rejected Reynolds' arguments, found that any reasonable person viewing the images would conclude they were or included cartoons, and found Reynolds in breach of the MSA and in civil contempt for violating the Consent Decree. The trial court failed to specify which images in the *Camel Farm* ad it found to be prohibited cartoons or which prong of the definition the images violated. It merely stated "we know a cartoon when we see it," that any reasonable person would consider the images cartoons, and that the interpretation of the definition offered by Reynolds' witnesses failed to "capture the diversity that is the cartoon in American culture." (Trial Opinion at 2). The trial court also found Reynolds liable on the basis of the editorial content because the entire nine-page gatefold "clearly formed an integrated whole, with common elements and themes, and would have been understood as such by any reasonable consumer." (Trial Opinion at 9). It also noted that Reynolds "had the ability and the duty to avoid such indivisible commingling of its tobacco advertising and promotions with such indisputable cartoons." (Trial Opinion at 2). In support of this conclusion, the trial court noted that Reynolds

specifically requested that the editorial content and its advertisement shared the common theme of independent rock music; Reynolds never advised *Rolling Stone* of the cartoon ban; and it knew or should have known that cartoons were a frequent element in the magazine's advertising and editorial content. It imposed compensatory damages "in an amount equal to a full page, youth-oriented, anti-smoking advertisement, to run in all copies of a single issue of *Rolling Stone* magazine circulated in Pennsylvania, whether by subscription or single copy sales." (Trial Opinion at 12). It also imposed a coercive sanction in the amount of $302,095.95—the total amount Reynolds paid *Rolling Stone* for the nationally-run gatefold ad—which could be purged by publication of the foregoing anti-smoking advertisement within a year of the court's decision. Reasonable counsel fees and costs were also awarded to the Commonwealth. Reynolds then appealed to this Court.[4]

■ As a preliminary matter, Reynolds argues that the trial court erred in finding that it violated the MSA when the Commonwealth never alleged such a violation. In its Answer to Reynolds' Motion to Strike, the Commonwealth made it clear that its initial Motion to Enforce was brought solely under the Consent Decree, stating:

[T]o the extent that Reynolds is suggesting that the Commonwealth was moving

App. 775, 211 P.3d 448 (2009). However, the appellate court found the images in the *Camel Farm* ad were cartoons because they depicted radios, televisions and speakers transforming into crops and aircraft as they grew from the ground and flew through the air. Finally, the Circuit Court of Cook County, Illinois found that Reynolds did not violate the MSA by causing cartoons to be used. Therefore, it stated that "the issue of whether this advertisement contained 'Cartoons' is moot." *State v. Philip Morris, Inc.*, No. 96 L 13146 (Cook Cty.Cir.Ct. Feb. 11, 2009). Upon the State's

motion to reconsider, the court specifically found that the *Camel Farm* imagery did not include cartoons. *State v. Philip Morris, Inc.*, No. 96 L 13146 (Cook Cty.Cir.Ct. Jan. 15, 2010).

4. Our scope of review upon appeal from a contempt order is limited to whether the trial court abused its discretion or committed an error of law. *Jackson v. Hendrick*, 764 A.2d 1139 (Pa.Cmwlth.2000).

pursuant to the Master Settlement Agreement (hereinafter "MSA") in addition to the Consent Decree that premise is incorrect. As the text of the Commonwealth's Motion makes clear, *the motion is filed solely pursuant to the Consent Decree.* (Commonwealth's Answer to Motion to Strike at ¶1) (Emphasis added). We agree with Reynolds that the trial court erred in *sua sponte* finding a violation of the MSA had occurred when neither party to the agreement properly alleged such a violation and the Commonwealth went so far as to expressly disclaim any reliance on the MSA.

The Commonwealth admits that it filed its Motion to Enforce under the Consent Decree in order to gain quicker access to the trial court. Under the terms of the agreement, there is no notice requirement when a party seeks to enforce the terms of the Consent Decree. (MSA § VII(b)). However, the agreement clearly requires a party to provide 30 days written notice of its intent to seek enforcement of the MSA. (MSA § VII(c)(2)). The Commonwealth admits that it did not provide Reynolds with written notice of its intent to enforce the MSA. Rather, it now argues that its initial Motion to Enforce provided Reynolds with the proper notice and because both the MSA and Consent Decree contain the identical cartoon ban, it follows that violation of one document equates to violation of the other. However, such blatant disregard of the notice provision and assurance that it was proceeding solely under the Consent Decree prohibit the Commonwealth from now pursuing this action under the MSA. The trial court erred in finding Reynolds violated the MSA, and our analysis will focus solely on the trial court's finding of civil contempt for violation of the Consent Decree.

■■■ Reynolds' main argument on appeal is that the trial court erred in finding that it violated the Consent Decree[5] because the *Camel Farm* imagery does not contain prohibited cartoons and because the trial court applied its own sense of what a cartoon was, not the MSA definition which prohibits the depiction of an object, animal or person with (1) "comically exaggerated features," (2) "anthropomorphic technique," or (3) "unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." We agree with Reynolds that the images do not meet this definition.

The images in Reynolds' *Camel Farm* advertisement clearly do not violate the first prong of the definition because they do not exhibit "comically exaggerated features." Rather, they are photographs of actual people, animals, plants and objects which have been arranged in a retro-style collage. Likewise, none of the images violate the second prong, which prohibits the use of "anthropomorphic technique." Nowhere do we see animals or objects exhibiting uniquely human characteristics, such as walking upright, talking, or driving a

---

**5.** A consent decree is contractual in nature; therefore, the principles of contract construction apply. *Lower Frederick Twp. v. Clemmer,* 518 Pa. 313, 543 A.2d 502 (1988). In the absence of fraud, mistake or accident, the court cannot modify or vary the terms of the consent decree. *Id.* Rather, it must consider the purpose of the agreement and ascertain the intent of the parties. *Id.; Kripp v. Kripp,* 578 Pa. 82, 849 A.2d 1159 (2004). It is also well-established that an order or consent decree "forming the basis for [a] contempt finding must be definite, clear, and specific, leaving no doubt or uncertainty regarding the prohibited conduct." *McNelis v. Lear,* 889 A.2d 617, 619 (Pa.Super.2005). All inferences and ambiguities in the consent decree must be construed in favor of the alleged contemnor. *Lachat v. Hinchliffe,* 769 A.2d 481, 490 (Pa.Super.2001).

car.[6] The only real argument that can be made is that the *Camel Farm* imagery violates the third prong of the definition which prohibits the depiction of objects or animals with "unnatural or extrahuman abilities." [7]

The third prong of the definition reads in its entirety: "the attribution of unnatural or extrahuman abilities, *such as* imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." Given the qualifying language "such as," the one trait that unifies all of the abilities listed in the third prong of the definition is that they illustrate the types of super-hero-like powers that are particularly attractive to youth. Under *ejusdem generis*[8] and *noscitur a sociis*,[9] canons of contract interpretation, the qualities prohibited are limited to those that depict unnatural or extrahuman abilities similar to the super-hero-like powers specifically listed in the definition.[10] Taken as a whole this provision prohibits depictions of "objects" such as SpongeBob Square Pants or Transformers or "Kitt" on Knight Rider that exhibit unnatural powers or superhuman qualities. Photographs of a radio with a propeller floating in the sky or speakers perched on stems growing out of the ground are a far cry from the unnatural or superhuman "powers" of those listed.

Moreover, one of the keys to contract interpretation is the intention of the parties. The admitted purpose of the Commonwealth and Reynolds with respect to the MSA and Consent Decree was "to reduce Youth smoking" (MSA at 1–2) by prohibiting the use of cartoons in tobacco advertising. As the Washington trial court aptly stated, "[t]he ban on the use of cartoons in tobacco ads is rooted in the allure that traditional cartoons hold for children." Nothing in the *Camel Farm's* surrealistic, photographic, sophisticated imagery can be said to encompass the allure of cartoons, let alone meet the definition contained in the MSA. Given that all inferences and ambiguities in the consent decree must be construed in favor of the alleged contemnor, the images at issue do not violate the Consent Order.

**6.** It should be noted that neither the California appellate court nor the Washington appellate court, the only two courts which found the *Camel Farm* imagery contained cartoons, relied upon either of these two prongs of the definition in reaching their decisions.

**7.** The California appellate court concluded that some images in the ad met the definition because the depictions of a flying radio and a jet-powered tractor attributed unnatural abilities to these objects. Similarly, the Washington appellate court stated that radios, televisions and speakers do not naturally fly through the air or grow out of the ground. Those two courts utilized a broad interpretation of the definition of cartoon basically stating that it encompasses *any and all* attributions of unnatural or extrahuman abilities and did not take into consideration the qualifying language.

**8.** Under the principle of *ejusdem generis*, "[i]t is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." *McClellan v. Health Maintenance Organization of Pennsylvania*, 546 Pa. 463, 472, 686 A.2d 801, 805 (1996).

**9.** "The ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." *Northway Village No. 3, Inc. v. Northway Properties, Inc.*, 430 Pa. 499, 505–06, 244 A.2d 47, 50 (1968).

**10.** This interpretation of the definition was also adopted by the trial courts in Maine and Ohio.

■ Reynolds also argues on appeal that the trial court erred in finding it liable for the cartoons contained in *Rolling Stone's* editorial. The Consent Decree prohibits Reynolds from using or causing cartoons to be used in the advertisement or promotion of its tobacco products. According to Reynolds, both "using" and "causing" are active verbs and the language of the cartoon ban must, therefore, be read to prohibit Reynolds from certain affirmative conduct. Because it did not prepare, pay for, or preview the separate, independently produced editorial, Reynolds argues that it did not act affirmatively with respect to the cartoons contained in the editorial, and it cannot be held responsible for their placement.

The Commonwealth counters that Reynolds' *Camel Farm* ad enveloped, integrated, and cross-pollinated the editorial content so completely that the nine pages in question "constitute a single integrated whole." (Trial Court Opinion at 2). It argues that even though it did not produce the editorial content, Reynolds had the affirmative duty to make sure the editorial did not contain prohibited cartoons wrapped around its ad, and it should have known that cartoons are a frequent element in the magazine's editorial content.

First, we disagree with the trial court's finding that the nine-page gatefold constitutes an integrated whole. The ad pages and the editorial pages are distinct in both style and content having completely different artistic approaches—the *Camel Farm* ad employs a vintage-style photo collage of people, farm equipment and plants, having an overall surreal look; while the *Rolling Stone* editorial contains hand-drawn illustrations of robots, planets and aliens, with a futuristic feel. A reasonable person viewing the barn door gatefold would *not* have concluded that all nine pages were an integrated whole as held by the trial court.

Second, we disagree[11] with the trial court's finding that the Consent Decree placed a duty upon Reynolds to insure that editorial content around its ads did not contain prohibited cartoons. While the cartoon ban prohibits Reynolds from "using or causing" cartoons to be used in the advertising or promotion of its tobacco products, those are active verbs only prohibiting Reynolds from engaging in certain affirmative conduct. Nothing in the language of the Consent Decree imposes an affirmative duty upon Reynolds to insure that third-parties, such as magazine publishers, refrain from using cartoons in close proximity to its tobacco advertisements. It is true that Reynolds never informed *Rolling Stone* of the cartoon ban and it was aware that its *Camel Farm* ad and the editorial would share a common theme—the promotion of independent music. However, this is not affirmative conduct and does not rise to the level of *causing* cartoons to be used in the *Rolling Stone* editorial.

Third, all of the facts surrounding the placement of the *Camel Farm* advertisement indicate that Reynolds had nothing to do with and no control over the adjacent editorial content. Reynolds did not pay for or preview the editorial, and the Commonwealth admits that Reynolds did not participate at all in its preparation. During a meeting between Reynolds' employees and agents of *Rolling Stone* on May 17, 2007, the magazine's agents showed Reynolds an example of a gatefold advertisement which ran in a recent issue. This gatefold, which was an advertisement for Patron brand tequila, consisted of tradi-

11. The courts in Maine, California and Washington also found that the language of the Consent Decree prohibited only certain affir- mative conduct and concluded that Reynolds' actions did not amount to using or causing cartoons to be used in the editorial.

tional text and photographs, not cartoons. Based upon this proffered example and the fact that the magazine has an adult readership of almost 90 percent, Reynolds had a good faith belief that the editorial would not contain prohibited cartoons.

The common theme of the promotion of independent music and adjacency of the ads and editorial are simply not enough to find that Reynolds acted affirmatively in using or causing cartoons to be used in the advertisement or promotion of its tobacco products. In addition, no provision of the Consent Decree renders Reynolds liable for the independent acts of a third-party such as *Rolling Stone*.[12]

■ Even if we had found that Reynolds violated the Consent Degree, we still would not have found damages or coercive sanctions to be appropriate. The *Camel Farm* advertisement was run in a single issue of a magazine with an adult readership of almost 90%, and it did not depict smoking at all. Even if a few of the *Camel Farm* images met the definition of cartoons, it was a minor, technical violation and the majority of the images were not cartoons. In addition, the Commonwealth failed to provide any evidence that it suffered actual damage or compensable harm caused by Reynolds' violation. The trial court also imposed a coercive sanction in the amount of $302,095.95 on the finding of civil contempt. This sanction was intended to coerce Reynolds into satisfying the compensatory damages as it could be purged by publication of the anti-smoking advertisement. The purpose of a civil contempt finding is to halt the contemnor's offending behavior. That has already been accomplished in this case because Reynolds ceased its *Camel Farm* advertising campaign and voluntarily shut down

the *Camel Farm* website. Also, Reynolds voluntarily added language to its advertising contracts which prohibit placement of future ads near or adjacent to cartoons. Because Reynolds agreed to stop the purportedly offensive behavior and there was lack of evidence justifying the award of compensatory damages, civil contempt damages or sanctions should not have been awarded.

Accordingly, for all the foregoing reasons the order of the trial court is reversed.

Judge LEAVITT and Judge BROBSON did not participate in the decision in this case.

### ORDER

AND NOW, this *17th* day of *August,* 2010 the decision of the Court of Common Pleas for Philadelphia County, First Judicial District, dated May 12, 2009, is reversed.

### CONCURRING OPINION BY Judge McCULLOUGH.

I write separately because, unlike the majority, I agree with the Commonwealth and would hold that, similar to the Washington and California courts, some images contained within the *Camel Farm* advertisement do meet the third prong of the definition of "Cartoon" in the Master Settlement Agreement (MSA), as incorporated in the Consent Decree. Specifically, the third prong of the definition includes "the attribution of unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." A flying radio and a television growing from

12. Reynolds raises several additional arguments in its brief, including that the trial court erred in failing to apply the legal standard for civil contempt. Given our above findings, these issues are moot.

759

a plant stem are inanimate objects displaying unnatural abilities that I believe fit within this definition.

Indeed, even under the analysis of the majority in construing that the one trait that unifies all of the abilities listed in the third prong of the definition is that they illustrate the types of super-hero-like powers that are particularly attractive to youth, the flying radio and television growing from a plant stem also convey such appeal. What more super-hero-like ability is there than flying? Further, the majority determines that, taken as a whole, this provision prohibits depictions of "objects" such as Sponge Bob Square Pants, Transformers or "Kitt," the talking car from the television series "Knight Rider," that exhibit unnatural powers or superhuman qualities. A radio or television displaying such unnatural powers or superhuman qualities are no less such "objects" than a sponge, a transformer or a car. Contrary to the majority's finding that the *Camel Farm's* surrealistic imagery does not encompass the allure of cartoons, I would hold, as did the Washington court, that it does. Clearly, the intent of the MSA/Consent Decree was not only to address existing public health concerns but to prevent youth from being lured into suffering the same.

However, notwithstanding that there are parts of the *Camel Farm* advertisement that contain images that fit within the definition of "Cartoon" in the MSA/Consent Decree, I agree with the majority opinion that, at least in this instance, it was a minor, technical violation and that

the majority of the images were not cartoons. Hence, the violations were *de minimis* and R.J. Reynolds cured the same by ceasing its *Camel Farm* advertising campaign and voluntarily shutting down the Camel Farm website. Further, I agree with the majority opinion that nothing in the MSA/Consent Decree placed a duty upon R.J. Reynolds to insure that third parties refrain from using cartoons in close proximity to its tobacco advertisements[1] and that the Commonwealth failed to provide any evidence of actual damages or compensable harm caused by the aforementioned violations given R.J. Reynolds' prompt response to remove the advertisement and add language to its advertising contracts which prohibit placement of future advertisements near or adjacent to cartoons.[2] Therefore, I concur in the result reached by the majority.

1. Rather, R.J. Reynolds was required to advise its advertising agency, Kaart Marketing, that its own advertisement could not depict cartoons.

2. I note that, unlike the MSA which requires the Commonwealth to provide R.J. Reynolds with written notice prior to initiating litigation with respect to purported violations, the

Consent Decree merely requires the Commonwealth to issue a cease and demand letter prior to filing a motion to enforce the same. (Consent Decree, Paragraph VI(A), R.R. at 7a.) While no such letter is evident in the record, R.J. Reynolds did not raise this issue before the trial court or this Court.